JUDGE KATHLEEN CARDONE          FILED

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**  2019 JUL 18  PM 3: 30

1

2   **Federal Trade Commission**, and

CLERK U.S DISTRICT COURT
WESTERN ~~~~~~ CT OF TEXAS
BY_____
DEPUTY CLERK

3   **State of Ohio ex rel. Attorney General**
4   **Dave Yost,**

No.    :19-CV-

5          Plaintiffs,

**EP19CV0196**

6   v.

FILED UNDER SEAL

7   **Educare Centre Services, Inc.,** a New
8   Jersey corporation, also dba Credit Card
    Services, Card Services, Credit Card
9   Financial Services, Care Net, Tripletel
    Inc., Revit Educ Srvc, L.L. Vision, Care
10  Value Services, and Card Value Services,

**COMPLAINT FOR**
**PERMANENT INJUNCTION**
**AND OTHER EQUITABLE**
**RELIEF**

11
    **Tripletel, Inc.,** a Delaware corporation,
12
    **Prolink Vision, S.R.L.,** a Dominican
13  Republic limited liability company,

14
    **Sam Madi**, individually and as an owner,
15  officer, member, and/or manager of
    Educare Centre Services, Inc.,

16
    **Mohammad Souheil a/k/a**
17  **Mohammed Souheil and Mike**
    **Souheil**, individually and as an owner,
18  officer, member, and/or manager of
    Prolink Vision, S.R.L.,
19

20  **Wissam Abedel Jilal a/k/a Sam Jilal**,
    individually and as an owner, officer,
21  member, and/or manager of
    Prolink Vision, S.R.L.,
22

23  **Charles Kharouf**, individually and as an
    owner, officer, member, and/or manager
24  of
    Prolink Vision, S.R.L.,
25

26          Defendants,

27  **9896988 Canada Inc.,** a Canadian
    company,
28

            Relief Defendant.

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Ohio, for their Complaint allege:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b), 57b, and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, the appointment of a receiver, an asset freeze, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

2.      The State of Ohio, by and through its Attorney General, Dave Yost, brings this action pursuant to the Telemarketing Act, 15 U.S.C. § 6103, the Ohio Consumer Sales Practices Act ("CSPA"), O.R.C. 1345.07, and the Ohio Telephone Solicitation Sales Act ("TSSA"), O.R.C. 4719.01 *et seq.*, in order to obtain temporary, preliminary, and permanent injunctive relief, consumer damages, and other equitable relief from Defendants.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), and (c), and 15 U.S.C. § 53(b).

## SUMMARY OF THE CASE

5.      Since at least February 2016, Sam Madi, Mohammad Souheil (a/k/a Mohammed Souheil and Mike Souheil), Wissam Abedel Jilal (a/k/a Sam Jilal), Charles

Kharouf, Educare Centre Services, Inc. ("Educare"), Tripletel, Inc. ("Tripletel"), and Prolink Vision, S.R.L. ("Prolink") (collectively, "Defendants") have engaged in a deceptive telemarketing scheme that markets a credit card interest rate reduction service ("CCIRR service") to consumers throughout the United States.

6.      Defendants cold-call consumers, using live calls and prerecorded messages (commonly known as a "robocalls"), promising that, in exchange for a fee ranging from $798 to $1,192, they will obtain substantially lower interest rates on consumers' credit cards. To help lure consumers to purchase the CCIRR service, Defendants promise a 100% "money-back guarantee" if Defendants fail to deliver the promised, substantially lower interest rate or the consumers are otherwise dissatisfied with the service.

7.      Defendants' promises are false or unsubstantiated. For the vast majority of consumers who pay their fee, if not all, Defendants do not secure the promised substantial rate reduction. In addition, Defendants routinely fail to honor their money-back guarantee.

8.      Defendants collect their service fee from consumers through remotely created checks or remotely created payment orders (collectively "RCPOs") drawn against consumers' checking accounts. The TSR expressly prohibits such use of RCPOs in connection with telemarketing sales.

9.      Madera Merchant Services, LLC, a Texas-based company, and associated companies ("Madera"), which run an unlawful payment processing scheme, provide Defendants with the means to collect payments from consumers through RCPOs. With Madera's support, Defendants have taken at least $11.5 million from consumers' bank accounts via RCPOs. Defendants have taken money from consumers located in the Western District of Texas. In addition, Madera, on behalf of Defendants, deposited money into and withdrew money from banks located in the Western District of Texas that Defendants obtained from consumers.

10.    Filed concurrently with this action, the FTC and the State of Ohio also filed an action against Madera and its principals. *See FTC v. Madera Merchant Services, LLC* (W.D. Tex. filed Jul. 18, 2019).

11.    Defendants' deceptive CCIRR service scheme violates the FTC Act, the TSR, and Ohio's CSPA, and has injured numerous financially distressed consumers across the United States.

## PLAINTIFFS

12.    The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

13.    The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 57b.

14.    Plaintiff State of Ohio is one of the fifty sovereign states of the United States, and by and through its Attorney General, Dave Yost, it brings this action under O.R.C. 1345.01 *et seq.* and O.R.C. 4719.01 *et seq.* Pursuant to the authority found in the Telemarketing Act at 15 U.S.C.      § 6103(a), Plaintiff State of Ohio is also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Ohio residents. This Court has supplemental jurisdiction over Plaintiff State of Ohio's state law claims under 28 U.S.C. § 1367.

## DEFENDANTS

1

2      15.     Educare sells the CCIRR service at issue, and Prolink operates a call center

3   that telemarkets the CCIRR service to consumers on behalf of Educare.

4      16.     The four individual defendants are, or were during times relevant to the

5   Complaint, officers or managers of Educare or Prolink, and have directly participated in or

6   controlled or had the authority to control the unlawful conduct challenged by the Complaint.

7
        ***The Corporate Defendants***
8

9      17.     **Educare Centre Services, Inc.**, also dba Credit Card Services, Card

10  Services, Credit Card Financial Services, Care Net, Tripletel, Inc., Revit Educ Srvc, L.L.

11  Vision, Care Value Services, and Card Value Services is a New Jersey corporation with its

12  registered address at 244 5th Avenue, Suite 11417, New York, NY 10001.

13
       18.     Educare has no website and does not appear to have a physical location in
14
    the United States.  Its president and sole director, Sam Madi, appears to operate the
15
    company from Canada.
16

17     19.     Educare sells the CCIRR service at issue in the Complaint.

18     20.     Educare contracts with and supervises telephone call centers, including

19  Prolink, to market the CCIRR service.

20
       21.     Educare has been the subject of more than 100 Better Business Bureau
21
    ("BBB") consumer complaints and it and its dbas, including Credit Card Services and Care
22
    Net, have received a "D+" or "F" rating from the BBB serving the Metropolitan New York
23
    area.  Educare routinely fails to respond to consumer complaints to the BBB.
24

25     22.     At all times material to this Complaint, acting alone or in concert with others,

26  Educare has advertised, marketed, distributed, or sold the products and services at issue in

27  this Complaint to consumers throughout the United States.  Educare transacts or has

28  transacted business in this district and throughout the United States.

23.     **Tripletel, Inc.** is a Delaware corporation with its registered address at 910 Foulk Road, Suite 201, Wilmington, DE 19803.

24.     Tripletel is a dba of Educare, which received $2.3 million in deposits from Madera.

25.     **Prolink Vision, S.R.L.** is a Dominican Republic limited liability company with its principal place of business at Av. 27 de Febrero Esq. Tiradentes, Plaza Merengue, Segundo Piso, Local 214, Ens. Naco, Santo Domingo.

26.     Prolink is a telemarketer operating a telephone call center in the Dominican Republic.  It has been marketing the CCIRR service sold by Educare since at least February 2016.  In its marketing of the CCIRR service sold by Educare, Prolink telemarketers have: (A) initiated numerous unsolicited telephone calls, including robocalls, to U.S. consumers; (B) made unlawful telemarketing sales pitches regarding the CCIRR service sold by Educare; (C) collected U.S. consumers' personal information, such as a Social Security number, email address, credit card issuer and number, and bank account and routing numbers; and (D) initiated three-way telephone calls with the U.S. consumers and the customer service departments of the U.S. banks that issued the credit cards to the U.S. consumers.

27.     Prolink received more than $1.8 million in wire payments from the U.S.-based Educare.

28.     Prolink has an English language website at www.prolinkvision.com and a Facebook webpage at www.facebook.com/Prolinkvision.

29.     Prolink's officers Mohammed Souheil and Charles Kharouf, and previous officer Wissam Abedel Jalil, appear to operate Prolink out of Canada.

30.     At all times material to this Complaint, acting alone or in concert with others, Prolink has advertised, marketed, distributed, or sold the products and services at issue in

this Complaint to consumers throughout the United States. Prolink transacts or has

transacted business in this district and throughout the United States.

### Individual Defendants

31.     **Sam Madi** ("Madi") is a Canadian citizen who resides in Montreal, Québec.

32.     Madi is the president and sole director of closely-held Educare, which he

appears to operate from Canada. Madi executed an application for Educare's virtual office at

244 5th Avenue, Suite 11417, New York, NY 10001. He also has signatory authority on

multiple business checking accounts in the United State in the name of Educare and has

written thousands of dollars in checks against Educare's bank accounts that were cashed for

his own benefit.

33.     In or around September 2017, Madi visited Prolink's office in the Dominican

Republic to, among other things, present reward certificates to several Prolink employees.

During his visit, Madi also took photos with Prolink employees; one such photo is posted to

Prolink's Facebook page, identifying Madi as Prolink's "General Manager."

34.     At all times material to this Complaint, acting alone or in concert with others,

Madi has formulated, directed, controlled, had the authority to control, or participated in the

acts and practices of Educare, including the acts or practices set forth in this Complaint.

Madi transacts or has transacted business in this district and throughout the United States.

35.     **Mohammad Souheil**, a/k/a Mohammed Souheil and Mike Souheil

("Souheil") is a Canadian citizen who resides in Montreal, Québec.

36.     Souheil is an owner and president of both Prolink and relief defendant

9896988 Canada Inc., which, together, have received wire transfers from Educare totaling

more than $4 million.

37.     Between 2008 and 2009, Souheil and defendant Wissam Abedel Jilal operated

a company known as FCS International ("FCS"), which exploited its membership in an

American Express affiliate program to market and sell CCIRR services to American Express cardholders.

38.     In 2009, American Express terminated its affiliate relationship with FCS after receiving numerous complaints from cardholders about FCS's service.  Consumers complained that FCS failed to deliver on its promise to lower their credit card interest rates in exchange for a fee, and submitted credit card applications on behalf of consumers without authorization.

39.     Souheil is the director and president of Globex Telecom Inc., a telecommunications service provider, which received more than $1 million in wire payments from Educare.  As the agent of Globex Telecom, Inc., Souheil also filed a letter of compliance with the U.S. Federal Communications Commission.

40.     At all times material to this Complaint, acting alone or in concert with others, Souheil has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Prolink and relief defendant 9896988 Canada Inc., including the acts or practices set forth in this Complaint.  Souheil, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

41.     **Wissam Abedel Jalil** a/k/a Sam Jalil ("Jalil") is a Canadian citizen who resides in Montreal, Québec.

42.     Jalil executed an application for Educare's virtual office at 244 5th Avenue, Suite 11417, New York, NY 10001.  He also has signatory authority on a business checking account in the name of Tripletel Inc., a dba of Educare, which received approximately $2.3 million in deposits from Madera.

43.     As described in Paragraphs 37-38 above, between 2008 and 2009, Jilal (along with Souheil) operated a CCIRR scheme known as FCS, which marketed and sold CCIRR

services to American Express cardholders and generated numerous complaints about deceptive acts and practices.

44.     Jalil was an owner and officer of Prolink from at least October 19, 2015 until at least January 10, 2018.

45.     At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Prolink, including the acts or practices set forth in this Complaint.  Jalil, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

46.     **Charles Kharouf** is a Canadian citizen who resides in Montreal, Québec.

47.     Kharouf became an owner and officer of Prolink on or around January 10, 2018, more than two years after Prolink began telemarketing Educare's CCIRR service.

48.     Kharouf is also an owner and officer of 9322-4756 Québec Inc. also dba Devcostrat, a call center lead generator.  Before Kharouf acquired ownership in Prolink, Devcostrat received more than $41,000 in wire transfers from Educare.

49.     Kharouf has received more than $28,000 in wire transfers from Educare.

50.     At all times material to this Complaint, acting alone or in concert with others, Kharouf has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Prolink, including the acts or practices set forth in this Complaint. Kharouf, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

### *Relief Defendant*

51.     **9896988 Canada Inc.** is a Canadian corporation with a registered address of 7075 Place Robert-Joncas, Suite 225, St. Laurent, Québec H4M 2Z2, Canada.

52.     9896988 Canada Inc. has received funds in excess of $1 million that can be traced directly to Defendants' unlawful acts or practices alleged in this Complaint, and it has no legitimate claim to those funds.

## COMMON ENTERPRISE

53.     Defendants Educare and Tripletel have operated as a common enterprise while engaging in the unlawful acts and practice alleged in this Complaint.  Educare and Tripletel sold the CCIRR services at issue in this Complaint.  Both Madi and Jalil have executed applications for Educare's virtual office at its New York address.  Tripletel as a dba of Educare received $2.3 million in deposits from Madera.

54.     Educare and Tripletel have conducted business practices described herein through interrelated companies, which have a common business purpose, business functions, and employees; and that marketed and sold common services, shared revenues, and comingled funds.

55.     Because Educare and Tripletel operated as a common enterprise, each of the entities is jointly and severally liable for the acts and practices alleged below.  At all times material to this Complaint, Madi and Jalil formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Educare and Tripletel, which constitute the common enterprise.

## COMMERCE

56.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## REMOTELY CREATED PAYMENT ORDERS

## AND REMOTELY CREATED CHECKS

57.     An RCPO is a check or order of payment that the payee (typically a merchant or its agent) creates electronically, with software, using the payor's (typically a consumer) bank account information.

58.     Unlike with a conventional check, the payor does not sign the RCPO. Instead, the RCPO usually bears a statement indicating that the account holder (the account from which the money is to be drawn) authorized the check, such as "authorized by account holder" or "signature not required."

59.     RCPOs can be printed and manually deposited into the check clearing system like a conventional check.  An electronic version of an RCPO that looks like a paper check, but never exists in paper form, can also be deposited into the check clearing system using remote deposit capture—a system that allows a depositor to scan checks remotely and transmit the check images to a bank for deposit.

60.     RCPOs are generally subject to less oversight and monitoring than more prevalent methods of consumer payments, such as Automated Clearinghouse ("ACH") and debit and credit card transactions.

61.     Payments cleared through the ACH network are subject to oversight by NACHA - The Electronic Payments Association ("NACHA"), a self-regulatory trade association that enforces a system of rules, monitoring, and penalties for noncompliance. NACHA monitors the levels at which ACH debits are returned (or rejected) by consumers or consumers' banks, among other reasons, because high rates of returned transactions can be indicative of unlawful practices by merchants.

62.     The credit and debit card networks ("card networks"), such as MasterCard and Visa, also have rules regarding onboarding and monitoring of merchants, and penalties

for noncompliance.  These include heightened monitoring requirements for merchants designated as high risk, such as telemarketers.

63.     The card networks require network participants – including merchants, payment processors and merchant banks – to monitor transactions for unusual activity indicative of fraud or deception.  One prominent indicator is high chargeback rate. Chargebacks occur when customers contact their credit card issuing bank to dispute a charge appearing on their credit card account statement.  Merchants with high chargeback rates may be placed in a monitoring program and their sponsoring banks may be subject to fees and fines.

64.     Unlike ACH and debit and credit card transactions, RCPOs are not subject to centralized and systemic monitoring.

65.     Since June 13, 2016, the TSR has prohibited sellers and telemarketers from using RCPOs in telemarketing sales.  The FTC added this prohibition to the TSR because, after an extensive notice and comment process, it found little record of legitimate telemarketing business using RCPOs.

## DEFENDANTS' UNLAWFUL BUSINESS PRACTICES

66.     Since at least February 2016, Defendants have engaged in a telemarketing scheme that markets a CCIRR service to consumers using false or unsubstantiated claims. Defendants promise to reduce significantly the interest rate on consumers' credit cards, and further promise a 100% money back guarantee if the promised rate reduction does not materialize or the consumer is dissatisfied with the CCIRR service.  As described below, these promises are false or unsubstantiated.

67.     Defendants use RCPOs to collect payments from consumers in violation of the TSR, which expressly prohibits using RCPOs in connection with telemarketing sales.

## Defendants' Deceptive Telemarketing Campaign

68.     Since at least February 2016, Defendants have engaged in a plan, program, or campaign to advertise, market, promote, offer for sale, or sell a CCIRR service through interstate telephone calls to consumer throughout the United States.

69.     In numerous instances, Defendants have initiated, or directed others, including telemarketers with Prolink, to initiate unsolicited telemarketing calls that offer consumers an opportunity to lower their credit card interest rates.

70.     In numerous instances, Defendants' telemarketing calls deliver prerecorded voice messages.  These messages offer consumers the opportunity to secure credit card interest rates that are substantially lower from those consumers were paying, and instruct consumers to press a button on the telephone keypad to hear more about the service.

71.     Consumers who press a button on their telephone keypad to hear more about the service are connected to a live telemarketer who continues the deceptive sales pitch, as described below.  Many, if not all, of these telemarketers are associated with Prolink's call center.

72.     In numerous instances, Defendants' telemarketers fail to disclose to consumers, truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of the CCIRR service.  Instead, Defendants' telemarketers routinely identify themselves as representatives of "Credit Card Services," "Credit Card Financial Services," or similar Educare dbas that sound like the name of a bank or credit card company.

73.     In many instances, Defendants' telemarketers know the last four digits of at least one of the consumer's credit cards.  That fact often leads consumers to assume that they are speaking with a representative or agent of their bank or credit card company.

74.     Defendants' telemarketers guarantee to consumers that they can substantially reduce consumers' credit card interest rates.

75.     In numerous instances, Defendants' telemarketers have told consumers holding credit cards with high double-digit interest rates that the CCIRR service would reduce the interest rates on the consumers' cards to 0%-10%, or transfer the balance to credit cards with such substantially lower interest rates.

76.     For example, one telemarketer placed a consumer on hold, and returned a few minutes later stating that Defendants had permanently lowered the interest rate on one of consumer's credit cards to 3%, and would similarly lower the interest rates on the consumer's other credit cards if the consumer signed an online agreement.

77.     Another Defendants' telemarketer told a consumer paying about 29% on a combined credit balance of nearly $8,000 that Defendants worked with a bank that would give the consumer one new credit card with a 6.9% interest rate and a credit limit exceeding the consumer's combined balance.

78.     In numerous instances, Defendants' telemarketers tell consumers that using the CCIRR service will not harm the consumers' credit history.  Some of Defendants' telemarketers have represented that the CCIRR service will improve the consumers' credit history because the consumer will be able to pay off his or her credit card debt faster.

79.     Defendants' telemarketers typically instruct consumers to provide their personal information, such as a social security number, email address, credit card issuer and number, and bank account and routing numbers.

80.     Either before or after the consumers provide this information, Defendants' telemarketers tell consumers that they have to pay an up-front fee for the CCIRR service, which typically ranges from $798 to $1,192.

81.     In numerous instances, Defendants' telemarketers have told consumers that the significant savings the CCIRR service provides to the consumer would offset the fee payment.

82.     Defendants' telemarketers typically ask if the consumer agrees to the fee and the CCIRR service, and tell consumers that their responses are being recorded.

83.     Defendants' telemarketers often tell consumers that they will receive a written agreement describing the CCIRR service in the mail.  In numerous, if not all, instances, the consumers do not receive the promised agreement in the mail.

84.     In numerous instances, Defendants' telemarketers tell consumers that they will receive a text or email message asking them to confirm that they want to purchase the CCIRR service.  For example, one consumer received the following text message:  "Dear [consumer's name], Please reply YES to this msg to authorize the fee of $798 for services rendered by educare split into 5 payments.  Thank you!"

85.     As in the above instance, Defendants' telemarketers often do not disclose the identity of Educare or its dbas up front.  Instead, Educare or its dbas appear for the first time in the confirmation-request email or text.

86.     Consumers who respond to the confirmation-request text or email message typically receive a subsequent text or email message confirming the fee authorization.  For example, one consumer received the following text message: "[Consumer's name]: You have approved 5 payment of $159.60 for a total of $798 to be debited from your Account XXX Cst Srv: 866-456-1676"

87.     In numerous instances, Defendants' telemarketers and customer service agents have refused to honor requests to cancel service from consumers who have become concerned with or suspicious of the CCIRR service, including requests made on the same day the service was purchased.

88.     For example, in 2018, a telemarketer who identified himself as William Silva and a "financial advisor" for Card Services, refused a consumer's cancellation request after the consumer agreed to pay for the CCIRR service but then attempted to back out of the

1   deal upon realizing during the telephone call that Mr. Silva did not represent his credit card

2   company.

3        89.    Another Defendants' telemarketer told a consumer who requested to cancel

4   the CCIRR service on the same day of the purchase that it was too late because the

5   consumer had already agreed to the charges.

6        90.    Defendants have also threatened consumers who sought to cancel the

7   CCIRR service with sending the consumers' accounts to collections.

8        91.    For example, a telemarketer who identified himself as Jacob Scott with Care

9   Value Services told one consumer who requested cancellation of the CCIRR service that the

10   consumer could not cancel, and that Defendants were still going to debit the fees from

11   consumer's checking account, and if the consumer did not pay, Defendants would tack on

12   additional fees and sue him in court.

13        92.    In numerous instances, Defendants have drawn, or caused to be drawn,

14   payments from accounts of consumers who requested to cancel the CCIRR service and

15   instructed Defendants not to draw funds from their accounts.

16        93.    For example, in mid-2018, Educare debited nearly $800 over a period of 5

17   months from the checking account of a consumer who told Defendants' telemarketers and

18   customer service agents not to charge his account and made repeated requests to cancel the

19   CCIRR service.

**Unlawful RCPOs Drawn Against Consumers' Checking Accounts**

94.    To collect the fee for the CCIRR service, Defendants, with the help of

payment processor Madera, use personal information they solicit from consumers, including

bank account and routing number, to cause the creation of RCPOs drawn against

consumers' bank accounts.

95.     Many such RCPOs are returned by the consumers' banks for reasons such as "stop payment," "forgery," "closed account," and "unable to locate."

96.     During the relevant period, several bank accounts opened by Madera under various dbas of Educare had return rates of 20% or more.

97.     Since January 2016, Madera has transferred to Educare at least $11.5 million in consumer funds collected through RCPOs. Defendants and Madera have collected more than $7 million of that amount from consumers after June 13, 2016, the date on which the TSR started banning the use of RCPOs in connection with any telemarketing sales.

**Defendants Fail to Deliver the Promised Substantial Rate-Reduction**

98.     In some instances, after the consumers authorized the fee payment, Defendants' telemarketers initiate three-way telephone calls with the consumers and the customer service departments of the banks that issued the credit cards to the consumer. During these three-way calls, Defendants' telemarketers request, or prompt the consumers to request, that the bank reduce the interest rate on the consumers' credit cards.

99.     In some instances, Defendants' telemarketers have asked consumers to misrepresent or fabricate personal information to bank representatives.

100.    In most instances, the three-way calls that Defendants' telemarketers initiate with the consumers and the credit card issuing banks do not lead to the promised substantial interest rate reduction, if any at all.

101.    In numerous instances, Defendants use the information they obtain from consumers to apply on behalf of consumers, or advise the consumer to apply, for new credit cards with low introductory rates (commonly known as "teaser rates") and transfer their existing credit card balances to those new cards.

102.   For example, Defendants' telemarketer promised a consumer a new credit card with a 0% APR for 1 year and a 6.99% fixed rate thereafter, but the consumer actually received a new credit card with a 0% APR for 9 months and over 20% APR thereafter.

103.   In some instances, Defendants' telemarketers apply for new credit cards with teaser rates on behalf of consumers without consumers' knowledge or consent.

104.   For example, the consumer whose unsuccessful efforts to cancel the CCIRR service are discussed in Paragraph 88 of this Complaint received an email from Experian Credit Reporting stating that two credit card applications were submitted using his personal information.  Soon thereafter, the consumer received a telephone call from a representative of Chase Bank seeking to verify his application for a credit card, which the consumer had no prior knowledge of and did not authorize.

105.   Defendants' balance transfer tactic does not typically deliver the promised substantial rate reduction.  Consumers often cannot qualify for the new credit cards, and in any event, the reduced rates are only temporary and commonly followed by double-digit rates.

106.   After securing the consumer's payment and failing to provide the promised substantial rate reduction, Defendants often stop returning the consumer's phone calls and otherwise cease communicating with the consumer.

### Defendants Routinely Refuse to Issue Refunds

107.   In their sales pitches, Defendants' telemarketers routinely tout a 100% money-back guarantee if Defendants fail to deliver the promised substantially lower credit card interest rate, or if the consumer is otherwise dissatisfied with the CCIRR service.

108.   In numerous instances, Defendants do not honor the refund promises. Instead, Defendants routinely make it extremely difficult, if not impossible, for consumers to reach a representative via telephone to process refund requests.

109.   Many consumers have discovered that the contact number Defendants' telemarketer provided is no longer in service.

110.   Consumers who have been able to reach a representative of Defendants by telephone have reported being strung along with no refund or even partial refund issued.

111.   For example, one consumer made over 20 telephone calls to Educare in an effort to cancel the CCIRR service and get a refund, and spoke with various representatives who were difficult to understand, evasive, condescending, transferred her to a "manager" that never answered the phone, or misrepresented that Educare had delivered the promised interest rate reduction even though it had not done so.

112.   In addition, Educare has routinely failed to respond to consumer complaints and refund requests sent to it by the Better Business Bureau and state attorneys general.

## Defendants' Abusive Telemarketing Practices

113.   In numerous instances, Defendants, acting directly or through one or more intermediaries, have initiated telemarketing calls to consumers throughout the United States that delivered a prerecorded message promoting the CCIRR service, without first having obtained the consumer's signed express written agreement to receive such calls by or on behalf of Defendants.

114.   In marketing the CCIRR service, in numerous instances, Defendants, acting directly or through one or more intermediaries, have called telephone numbers listed on the National Do Not Call Registry maintained by the FTC, in various area codes throughout the United States, without Defendants' first paying the annual fee for access to the telephone numbers within such area codes.

115.   In numerous instances, Defendants have received fees they caused to be drawn from consumers' bank accounts during or immediately after the telemarketing call

offering the CCIRR service, but before Defendants had undertaken any efforts to reduce the consumers' credit card interest rates.

116.    In numerous instances, Defendants, acting directly or through one or more intermediaries, have caused the creation of RCPOs as payment for the CCIRR service offered or sold through telemarketing.

### Educare Transfers Ill-gotten Funds to the Relief Defendant

117.    Since at least February 2016, Educare has transferred at least $1 million to Relief Defendant 9896988 Canada Inc.  Those sums represent funds traced directly to Defendants' unlawful acts and practices alleged in this Complaint, and Relief Defendant 9896988 Canada Inc. has no legitimate claim to those funds.

### Ohio's Telephone Solicitor's Registration Requirement

118.    Ohio's Telephone Solicitation Sales Act, O.R.C. 4719.01 *et seq.*, generally requires telephone solicitors that make telephone solicitations to individuals in Ohio to register with and file a copy of a surety bond with the Ohio Attorney General.

119.    Defendants Educare and Prolink have been solicitors that make telephone solicitations to individuals in Ohio.  Nevertheless, they have neither registered as telephone solicitors with, nor provided a copy of a surety bond to, the Ohio Attorney General.

### <u>VIOLATIONS OF THE FTC ACT</u>

120.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

121.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

## COUNT ONE

**False or Unsubstantiated Credit Card Interest Rate Reduction and Refund Claims**

122.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of a debt relief service, Defendants have represented, directly or indirectly, expressly or by implication, that:

      A.      Consumers who purchase the CCIRR service would have their credit card interest rates reduced substantially; and/or

      B.      Consumers who purchase the CCIRR service would be entitled to a full refund if Defendants could not obtain a lower interest rate or if the consumer was not completely satisfied with the CCIRR service.

123.    In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 122 of this Complaint:

      A.      Consumers who purchase the CCIRR service do not have their credit card interest rates reduced substantially; and/or

      B.      Consumers who purchase the CCIRR service and do not obtain a lower interest rate or are not completely satisfied with the CCIRR service do not provided a full refund.

124.    Therefore, Defendants' representations as set forth in Paragraph 122 of this Complaint are false or misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

125.   In 1994, Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain sections thereafter.

126.   Defendants are all "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg). For purposes of the TSR, a "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R.     § 310.2(dd). A "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).

127.   "Telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call. 16 C.F.R. § 310.2(gg).

128.   Defendants are sellers or telemarketers of "debt relief services" as defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service" is any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector. 16 C.F.R. § 310.2(o).

129.   The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, any material aspect of any debt-relief service, including but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service. 16 C.F.R. § 310.3(a)(2)(x).

130.    The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

a.   The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

b.   The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

c.   To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

i.   Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

ii.   Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt. 16 C.F.R.    § 310.4(a)(5)(i).

131.    The TSR prohibits sellers and telemarketers from creating or causing to be created, directly or indirectly, a remotely created payment order as payment for goods or

services offered or sold through telemarketing. 16 C.F.R. § 310.4(a)(9). A remotely created payment order includes a remotely created check. 16 C.F.R. § 310.2(cc).

132. The 2003 amendments to the TSR established the National Do Not Call Registry, maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

133. The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at www.telemarketing.donotcall.gov, to pay any required fee(s), and to download the numbers not to call.

134. The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the call is made has paid the annual fee for access to the telephone numbers within that area code included in the Registry. 16 C.F.R. § 310.8.

135. The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to telephone numbers on the Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

136. The TSR prohibits initiating a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller. 16 C.F.R. § 310.4(b)(1)(v)(A).

137. The TSR requires telemarketers in an outbound telephone call or internal or external upsell to induce the purchase of goods or services to disclose the identity of the seller truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call. 16 C.F.R. § 310.4(d)(1).

138.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### (By the FTC and the State of Ohio)

### COUNT TWO

### Misrepresentations of Material Aspects of a Debt Relief Service

139.     In numerous instances since February 2016, in connection with the telemarketing of a debt relief service, Defendants have misrepresented, directly or by implication, material aspects of the service, including, but not limited to, that:

    A.    Consumers who purchase the CCIRR service would have their credit card interest rates reduced substantially; and/or

    B.    Consumers who purchase the CCIRR service would be entitled to a full refund if Defendants could not obtain a lower interest rate or if the consumer was not completely satisfied with the CCIRR service.

140.     Defendants' acts and practices, as set forth in Paragraph 139 above, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

### COUNT THREE

### Charging or Receiving a Fee in Advance of Providing

### Debt Relief Service

141.     In numerous instances since  February 2016 in connection with the telemarketing of a debt relief service, Defendants have requested or received payment of a fee or consideration for a debt relief service before:  (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement

1   agreement, debt management plan, or other such valid contractual agreement executed by

2   the consumer; and (b) the consumer has made at least one payment pursuant to that

3   agreement.

4        142.    Defendants' acts or practices, as set forth in Paragraph 141 above, are

5   abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

6
                              **COUNT FOUR**
7
                  **Use of Remotely Created Payment Orders**
8
                     **in Connection with Telemarketing**
9

10       143.    In numerous instances since June 13, 2016, Defendants have created or

11   caused to be created, directly or indirectly, a remotely created payment order as payment for

12   goods or services offered or sold through telemarketing.

13       144.    Defendants acts or practices, as set forth in Paragraph 143 above, are abusive

14   telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(9).

15

16                            **COUNT FIVE**

17              **Initiating Unlawful Prerecorded Messages**

18       145.    In numerous instances since February 2016, in connection with

19   telemarketing, Defendants have engaged in, or caused a telemarketer to engage in, initiating

20   outbound telephone calls that deliver prerecorded messages in violation of the TSR, 16

21   C.F.R. § 310.4(b)(1)(v)(A).

22
                              **COUNT SIX**
23
                  **Failing to Pay National Registry Fees**
24

25       146.    In numerous instances since February 2016, in connection with

26   telemarketing, Defendants have initiated, or caused others to initiate, an outbound telephone

27   call to a telephone number within a given area code when Defendants had not, either directly

28   or through another person, paid the required annual fee for access to the telephone numbers

within that area code that are included in the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## COUNT SEVEN

### Failure to Make Oral Disclosures Required by the TSR

147.    In numerous instances since February 2016, in connection with telemarketing, Defendants Prolink, Souheil, Jilal, and Kharouf have initiated, or caused others to initiate, an outbound telephone call to induce the purchase of a CCIRR service that failed to disclose the identity of the seller of the CCIRR service truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, in violation of the TSR, 16 C.F.R. § 310.4(d)(1).

## VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT

### (By the State of Ohio)

148.    Ohio's CSPA, O.R.C. 1345.01 *et seq.*, generally prohibits "suppliers" from engaging in unfair or deceptive acts or practices in connection with "consumer transactions."

149.    Defendants are "suppliers" as defined in O.R.C. 1345.01(C) because they, at all times relevant hereto, were engaged in the business of effecting or soliciting consumer transactions, whether or not they dealt directly with consumers.

## COUNT EIGHT

### Failing to Deliver Services or Provide Refunds

150.    As described in paragraphs 15-119 above, Defendants committed unfair or deceptive acts or practices in violation of the Failure to Deliver Rule, O.A.C. 109:4-3-09(A) and the CSPA, O.R.C. 1345.02(A), by accepting money from consumers for goods or services, and specifically offering services to reduce the consumers' credit card rates, and then permitting eight weeks to elapse without making shipment or delivery of the goods or services ordered, making a full refund, advising the consumer of the duration of an extended

1    delay and offering to send a refund within two weeks if so requested, or furnishing similar

2    goods or services of equal or greater value as a good faith substitute.

3    **COUNT NINE**

4    **Misrepresenting Characteristics of the Transaction**

5    151.     As described in paragraphs 15-119 above, Defendants committed unfair or

6

7    deceptive acts or practices in violation of the CSPA, O.R.C. 1345.02(A), by misrepresenting

8    that the subject of a consumer transaction has sponsorship, approval, performance

9    characteristics, uses, or benefits that it did not have, and specifically by (1) misrepresenting

10    that their services will substantially reduce consumers credit card interest rates,  (2)

11    misrepresenting that their services have a 100% money-back guarantee, and (3)

12    misrepresenting that they will send consumers a written agreement packet in the mail after

13    consumers agree to the service over the telephone.

14

15    **COUNT TEN**

16    **Using Remotely Created Payment Orders in Connection with Telemarketing**

17    152.     As described in paragraphs 15-119 above, Defendants committed unfair or

18    deceptive acts or practices in violation of the CSPA, O.R.C. 1345.02(A), by creating or

19    causing to be created, directly or indirectly, a remotely created payment order as payment for

20    goods or services offered or sold through telemarketing.

21

22    **VIOLATIONS OF THE OHIO TELEPHONE SOLICITATION SALES ACT**

23    **(by the State of Ohio)**

24    153.     Defendants initiated "telephone solicitations" to "purchasers," as they were

25    at all times relevant herein, engaged in initiating "communications" on behalf of "telephone

26    solicitors" or "salespersons" to induce persons to purchases "goods or services," as those

27    terms are defined in the TSSA, O.R.C. 4719.01(A).

28

154.    Defendants are "telephone solicitors" as that term is defined in the TSSA, O.R.C. 4719.01(A)(8), as they were at all times relevant herein, engaged in initiating telephone solicitations directly or through one or more salespersons from a location in Ohio or from a location outside of Ohio to persons in Ohio.

## COUNT ELEVEN

### Failure to Comply with Registration and Surety Bond Requirements

155.    As described in paragraphs 15-119 above, Defendants committed unfair or deceptive acts and practices in violation of the TSSA, O.R.C. 4719.02(A) and 4719.04(A), and the CSPA, O.R.C. 1345.02(A), by acting as a telephone solicitor without first having obtained a certificate of registration from the Ohio Attorney General, and filing a copy of a surety bond in the amount of at least fifty thousand dollars with the Ohio Attorney General.

## COUNT TWELVE

### Failure to Disclose the True Name of the Solicitor and Business

156.    As described in paragraphs 15-119 above, Defendants committed unfair or deceptive acts and practices in violation of the TSSA, O.R.C. 4719.06(A) and the CSPA, O.R.C. 1345.02(A), by failing to disclose the solicitor's true name and the name of the company on whose behalf solicitations were made, within the first sixty seconds of the telephone call.

## COUNT THIRTEEN

### Failure to Obtain Signed Written Confirmation of Sales

157.    As described in paragraphs 15-119 above, Defendants committed unfair or deceptive acts and practices in violation of the TSSA, O.R.C. 4719.07 and the CSPA, O.R.C. 1345.02(A), by taking payment from a consumer as the result of a telephone solicitation and not providing to, and receiving back from the consumer, a written confirmation that meets the requirements of O.R.C. 4719.07.

## COUNT FOURTEEN

### Relief Defendant

158.    Relief Defendant, 9896988 Canada Inc. has received, directly or indirectly, funds or other assets from Defendants that are traceable to funds obtained from Defendants' customers through unfair or deceptive acts or practice described herein.

159.    Relief Defendant is not a bona fide purchaser with legal and equitable title to Defendants' customers' funds or other assets, and Relief Defendant will be unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of Defendants' unfair or deceptive acts or practices.

160.    By reason of the foregoing, Relief Defendant holds funds and assets in constructive trust for the benefit of Defendants' customers.

## CONSUMER INJURY

Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, the CSPA, and the TSSA. Defendants' fraudulent telemarketing scheme has caused more than $11.5 million to be withdrawn from consumers' checking accounts.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of

1   contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies,

2   to prevent and remedy any violation of any provision of law enforced by the FTC.

3   **PRAYER FOR RELIEF**

4   WHEREFORE, Plaintiffs FTC and the State of Ohio, pursuant to Sections 13(b)

5   and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b; the TSR; Section 1345.07 of the Ohio

6   CSPA; Section 4719.22 of the Ohio TSSA; and the Court's own equitable powers, request

7   that the Court:

8       A.      Award Plaintiffs such preliminary injunctive and ancillary relief as may be

9   necessary to avert the likelihood of consumer injury during the pendency of this action and

10  to preserve the possibility of effective final relief, including temporary and preliminary

11  injunctions, and an order providing for the turnover of business records, an asset freeze,

12  immediate access, the appointment of a receiver, and disruption of telephone service;

13      B.      Enter a permanent injunction to prevent future violations of the FTC Act,

14  the TSR, the Ohio CSPA, and the Ohio TSSA by Defendants;

15      C.      Award Plaintiffs such relief as the Court finds necessary to redress injury to

16  consumers resulting from Defendants' violations of the FTC Act, the TSR, the Ohio CSPA,

17  and the Ohio TSSA, including rescission or reformation of contracts, restitution, the refund

18  of monies paid, and the disgorgement of ill-gotten monies;

19      D.      Enter an order requiring Relief Defendant to disgorge all funds and assets, or

20  the value of the benefits it received from the funds and assets, which are directly traceable to

21  Defendants' unlawful acts or practice; and

22      E.      Award Plaintiffs the costs of bringing this action, as well as such other and

23  additional relief as the Court may determine to be just and proper.

24

25

26

27

28

1

2

3   Dated: 7/18/19

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Christopher E. Brown
J. Ronald Brooke, Jr.
Federal Trade Commission
600 Pennsylvania Ave., NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-2825 / cbrown3@ftc.gov
(202) 326-3484 / jbrooke@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION


DAVE YOST
Ohio Attorney General

Jeffrey Loeser (Ohio Bar #82144)
Erin Leahy (Ohio Bar #69509)
Assistant Attorneys General
Consumer Protection Section
30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
(614) 466-8831
jeff.loeser@OhioAttorneyGeneral.gov
erin.leahy@OhioAttorneyGeneral.gov

Attorneys for Plaintiff
STATE OF OHIO